**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**AMG SERVICES, INC.,**
**et al., Defendants.**

**Case No. 2:12–cv–00536–GMN–VCF.**

United States District Court,
D. Nevada.

Signed May 28, 2014.

---

Blaine T. Welsh, U.S. Attorney's Office, Las Vegas, NV, Courtney Anne Estep, Jason David Schall, Nikhil Singhvi, Federal Trade Commission, Helen Wong, Ioana Rusu, Lashawn M. Johnson, Washington, DC, for Plaintiff.

Andrew A. Kassof, Bradley Weidenhammer, Charles Kalil, Debra K. Lefler, Peter Wozniak, Richard Howell, Kirkland & Ellis LLP, Chicago, IL, Nicole Ducheneaux, Fredericks Peebles & Morgan LLP, Omaha, NE, Bradley S. Lui, Morrison & Foerster LLP, Washington, DC, Conly J. Schulte, Fredericks Peebles & Morgan LLP, Louisville, CO, David J. Merrill, David J. Merrill, P.C., Joshua M. Dickey, Bailey Kennedy, Von S. Heinz, Lewis Roca Rothgerber LLP, L. Christopher Rose, Michael R. Ernst, Jolley Urga Wirth Woodbury & Standish, Brian R. Reeve, Gregory A. Brower, Snell & Wilmer LLP, Jay Young, Robert L. Rosenthal, Howard and Howard, Patrick J. Reilly, Holland & Hart LLP, Las Vegas, NV, Francis J. Nyhan, Fredericks Peebles & Morgan LLP, Sacramento, CA, Jeffrey D. Morris, Nick J. Kurt, Ryan C. Hudson, Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, Whitney P. Strack, Nathan F. Garrett,

Graves Garrett LLC, Linda C. McFee, Robert Peter Smith, McDowell, Rice, Smith & Buchanan, P.C., Kansas City,. MO, Darren J. Lemieux, Lewis and Roca, E. Leif Reid, Lewis Roca Rothgerber LLP, Reno, NV, Alyssa D. Campbell, Legal Advocates for Indian Country, LLP, Owasso, OK, Paul C. Ray, Paul C. Ray, Chtd., North Las Vegas, NV, for Defendants.

## ORDER

GLORIA M. NAVARRO, Chief Judge.

Pending before the Court for consideration is the Report and Recommendation (ECF No. 539) of the Honorable Cam Ferenbach, United States Magistrate Judge, entered on January 28, 2014. On February 14, 2014, the Muir Law Firm, LLC and Timothy J. Muir (collectively the "Muir Defendants") filed their Limited Objection (ECF No. 541) and AMG Services Inc., SFS, Inc., Red Cedar Services, Inc., and MNE Services, Inc. (collectively the "Lending Defendants") filed their Objection. (ECF No. 542.) The Lending Defendants' Objection was joined by Defendants A MG Capital Management, Level 5 Motorsports, LeadFlash Consulting, Black Creek Capital Corporation, Broadmoor Capital Partners, Scott A. Tucker, Blaine A. Tucker, Don E. Brady, Troy LittleAxe, and Robert D. Campbell. (ECF Nos. 545, 548, 549, 552.) The Federal Trade Commission (the "FTC") filed its Response to the Muir Defendants' Objection (ECF No. 554) and Response to the Lending Defen-

dants' Objection (ECF No. 556) on March 2, 2014.

For the reasons discussed below, the Court will accept and adopt Magistrate Judge Ferenbach's Report and Recommendation (ECF No. 539) to the extent that it is not inconsistent with this opinion.

## I. BACKGROUND

The FTC's Complaint (ECF No. 1) alleges that Defendants violated portions of the Federal Trade Commission Act (the "FTC Act"),[1] the Truth in Lending Act ("TILA"),[2] and the Electronic Fund Transfer Act ("EFTA"),[3] in connection with the Defendants' activities in offering and extending "high-fee, short-term 'payday' loans and the collection of those loans." (Complaint 2:23–25, ECF No. 1.) The relevant facts underlying these claims primarily involve the loan application and loan repayment processes created by Defendants.[4]

### A. The Loan Application Process

In order to obtain a short-term, payday loan from the Lending Defendants, borrowers must complete online applications available through the Lending Defendants' websites[5] that request personal, employment, and financial information. (Defendants' Opposition 6:8–7:20, ECF No. 493.) With the information provided in the loan applications, the Lending Defendants determine a maximum amount that can be borrowed, which ranges between $150.00 and $800.00. (Id. 7:20–8:3.) This informa-

---

1. 15 U.S.C. §§ 41–58.

2. 15 U.S.C. §§ 1601–1667f.

3. 15 U.S.C. §§ 1693–1693r.

4. A more detailed recitation of the underlying facts of the case is set forth in Judge Ferenbach's Report and Recommendation (ECF No. 539.)

5. Though the various websites of the Lending Defendants differ in appearance, all of them provide the same information to borrowers in the same language, so all of the Lending Defendants' loan notes and other documents are essentially "identical." (Defendants' Opposition 6:12–16, ECF No. 493.)

tion also allows the Lending Defendants to make automatic withdrawals from the borrowers' bank accounts. (*Id.*)

In order to receive the loan proceeds, the borrower is required to select the desired loan amount, click four separate boxes accepting the Lending Defendants' terms and conditions, type his or her name in an electronic signature box, and click a button that reads: "I AGREE Send Me My Cash!" (*Id.* 8:4–9:22.) The borrowers, however, are not actually required to read the terms and conditions of their loans in order to receive the loan proceeds. *See generally* (*Id.*) On the contrary, the webpage format discourages the reading of the terms and conditions because it breaks the terms and conditions up into nine separate hyperlinks in eight or nine point font. *See* (*Id.* 8:4–9:22.) Furthermore, the most important link that takes the borrowers to the document at issue for the present motions—the *Loan Note and Disclosure* link—is the least conspicuous [6] of the nine links. (*Id.*) The boxes and disclosure links appear on the websites as follows:

- ☑ I have read and accept the terms of the *Application,* including the terms and provisions of the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION* contained therein.
- ☑ I have read and accept the terms of the *Privacy Policy & Electronic Disclosure and Consent Agreement.*
- ☑ I have read and accept the terms of the *Authorization Agreement.*
- ☑ I have read and accept the terms of the *Loan Note and Disclosure,* in-

cluding the terms and provisions of the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION* contained therein.[7]

(*Id.* 9:1–22.) If a borrow does click on the *Loan Note and Disclosure* link, the following document appears, which consists of a Truth in Lending Box ("TILA Box") and 764 words in densely packed, fine print with some of the fine print curiously contained in a second box:

## LOAN NOTE AND DISCLOSURE

**Borrower's Name:** _____

***Parties:*** In this Loan Note and Disclosure ("Note") you are the person named as Borrower above. "We" Ameriloan are the lender (the "Lender").

All references to "we", "us" or "ourselves" mean the Lender. Unless this Note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide to us shall be provided to Ameriloan at the fax number and address specified in this Note and in your other loan documents.

***The Account:*** You have deposit account, No * * * * * * * * * * *5844 ("Account"), at First Arkansas Bank and Trust ("Bank"). You authorize us to effect a credit entry to deposit the proceeds of the Loan (the Amount Financed indicated below) to your Account at the Bank.

***DISCLOSURE OF CREDIT TERMS:*** The information in the following box is part of this Note.

---

6. As noted by Judge Ferenbach, the *Loan Note and Disclosure* link is buried in the fourth paragraph and overshadowed by two all caps redundant links to the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION.* (Report & Recommendation 3:10–21, ECF No. 539.)

7. As depicted in Defendants' filings, hyperlinks are signified by underlining. *See* (Defendants' Opposition 8:4–9:22, ECF No. 493.)

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|:---:|:---:|:---:|:---:|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made the scheduled payment |
| 684.38% | $90.00 | $300.00 | $390.00 |

Your **Payment Schedule** will be: 1 payment of $390.00 due on 2010-09-24, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010-09-24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured.

**Prepayment:** *You may prepay your loan only in increments of $50.00.* If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is 9–8–2010.

*Itemization Of Amount Financed of $300.00*; **Given to you directly:** *$300.00*; **Paid on your account $0**

See below and your other contract documents for any additional information about prepayment, nonpayment and default.

***Promise to Pay:*** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge show above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

*See* (FTC's Memo in Supp. of MSJ 10:4–12, ECF No. 456) (reproducing this exact Loan Note Disclosure); *see also* (Defendants' Opposition 11:1–26, ECF No. 493) (reproducing a loan note from OneClickCash with the same exact provisions); (Lending Defendants' Mot. Summary

Judgment 5:11–22, ECF No. 461) (reproducing a loan note from USFastCash with the same exact provisions).

## B. The Repayment Process

As indicated by the emphasized terms located in the TILA Box portion of the Loan Note and Disclosure document, borrowers who obtain loans from the Lending Defendants are only obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (FTC's Memo in Supp. of MSJ 10:4–12, ECF No. 456) (showing a single repayment of $390.00 for a $300.00 loan); *see* (Defendants' Reply 7:1–15, ECF No. 512.) However, if borrowers fail to satisfy certain conditions precedent to establish the single payment option, then they are automatically enrolled in a ten pay-period "renewal" plan. (*Id.*) Under the renewal plan, the terms of which are scattered throughout the dense text below the TILA Box in the Loan Note and Disclosure document, a new finance charge accrues each pay-period and the borrower's principal balance only begins to decrease by $50.00 per pay-period following the fourth payday. (Defendants' Opposition 12:1–15:4, ECF No. 493.) As a result, if the borrower of a $300.00 loan from the Lending Defendants fails to successfully opt out of the renewal plan, his or her total payments would actually total $975.00 rather than the $390.00 shown in the TILA Box. (*Id.*) The following table illustrates such a payment schedule under the renewal plan:

| Payday | Payment | Finance Charge (30% of Remaining Principal Balance) | Amount Applied to Principal | Remaining Principal Balance | Total Paid to Date |
|--------|---------|-----------------------------------------------------|-----------------------------|-----------------------------|--------------------|
| 1 | $90.00 | $90.00 | $0.00 | $300.00 | $90.00 |
| 2 | $90.00 | $90.00 | $0.00 | $300.00 | $180.00 |
| 3 | $90.00 | $90.00 | $0.00 | $300.00 | $270.00 |
| 4 | $90.00 | $90.00 | $0.00 | $300.00 | $360.00 |
| 5 | $140.00 | $90.00 | $50.00 | $250.00 | $500.00 |
| 6 | $125.00 | $75.00 | $50.00 | $200.00 | $625.00 |
| 7 | $110.00 | $60.00 | $50.00 | $150.00 | $735.00 |
| 8 | $95.00 | $45.00 | $50.00 | $100.00 | $830.00 |
| 9 | $80.00 | $30.00 | $50.00 | $50.00 | $910.00 |
| 10 | $65.00 | $15.00 | $50.00 | $0.00 | $975.00 |
| Total | $975.00 | $675.00 | $300.00 | - | $975.00 |

(*Id.*); *see also* (FTC's Memo in Supp. of MSJ 14:1–14, ECF No. 456) (reproducing an internal document from Defendants' containing this payment schedule).

While borrowers technically have the ability to decline enrollment in the automatic renewal plan, the mechanism for declining enrollment is controlled by the Defendants through a convoluted email-and-hyperlink procedure.[8] *See* (Defen-

---

**8.** The fine print of Defendants' Loan Note and Disclosure document states that "[t]o decline this option of renewal, you must select your payment option using the Account Summary link sent to your email at least three business days before your loan is due." The document, however, appears to somewhat contradict the first statement when it also states that "[t]his Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed." (Defendants' Opposition 11:1–26, ECF No. 493.) Therefore, it appears ambiguous from the face of the document whether a borrower must use the email-and-hyperlink procedure to opt out of the renewal plan or whether simply notifying the

dants' Opposition 7:12–14; 14:15–16; 16:16–18, ECF No. 493.) For a borrower to decline enrollment in the automatic renewal plan using the email-and-hyperlink procedure, the following steps must be completed: (1) three days after the loan is funded, the Lending Defendants send an email to the borrower containing additional loan terms and a link to a webpage from where the borrower may elect to decline enrollment in the renewal plan; (2) the borrower opens the email, reads the new terms, accesses the webpage, and selects the option to opt out; and (3) the selection is executed three business days before the borrower's "loan is due." (*Id.* 7:12–14.)

The discrepancy between the repayment schedule prominently presented in the TILA Box and the renewal plan repayment schedule borrowers are automatically entered into by the Lending Defendants as well as the convoluted procedure for opting out of the renewal plan appear to have created significant confusion for many borrowers about the true cost of their loans. *See* (Exs. 167–168 of FTC's Dec. in Supp. of MSJ, ECF No. 455–167, 455–168) (compiling approximately 8,500 consumer complaints); (Oxenford Depo. 170:18–172:10, Ex. 113 of FTC's Dec. in Supp. of MSJ, ECF No. 455–113) (estimating that approximately eighty percent of the borrowers she spoke with complained that Defendants had withdrawn more from their accounts than the loan cost). Furthermore, Defendants' own internal records indicate that the Lending Defendants' employees were instructed to conceal how the loan repayment plans worked in order to keep potential borrowers in the dark. For example, in response to an email from one of the Lending Defendants' sales representatives suggesting they use clearer language when explaining a loan to potential borrowers, the Manager of Training and Development stated:

> I don't think that [this language] encourages a customer to GET a loan.... When we are trying to sell it I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained.

(Email, Ex. 72 of FTC's Dec. in Supp. of MSJ, ECF No. 455–72.)

### C. Procedural History of the Case

The FTC filed its Complaint on April 2, 2012, alleging claims for deceptive acts and practices and deceptive collection practices in violation of the FTC Act (Counts I & II), for failing to properly disclose certain loan information in violation of TILA and its implementing Regulation Z[9] (Count III), for conditioning the extension of credit on the preauthorization of recurring loans in violation of EFTA (Count IV), and for disgorgement as provided under section 13(b) of the FTC Act (Count V). (Complaint 15:1–20:8, ECF No. 1.)

On December 27, 2012, the Court signed an Order entering the parties' joint stipulation for preliminary injunction and bifurcation. (ECF No. 296.) The Bifurcation Order divided the litigation into two phases: a liability phase and a relief phase. (*Id.* 9:1–10:23.) During Phase I of the proceedings, the Court would adjudicate the merits of the FTC's claims for violations of the FTC Act, TILA, and EFTA. (*Id.* 9:1–24.) During Phase II of the proceedings, the Court would adjudicate the

---

Defendants of the desire to opt out would be sufficient to opt out. (Report & Recommendation 6:3–13, ECF No. 539.)

**9.** 12 C.F.R. § 1026.

remaining issues, including whether the various Defendants constitute a common enterprise. (*Id.* 10:1–19.)

On July 18, 2013, the Lending Defendants as well as Defendants AMG Capital Management, Level 5 Motorsports, Lead-Flash Consulting, Black Creek Capital Corporation, Broadmoor Capital Partners, Scott A. Tucker, Blaine A. Tucker, Don E. Brady, Troy LittleAxe, and Robert D. Campbell (collectively the "Settling Defendants") stipulated to settle Counts II & IV with the FTC. (Joint Motion for Stipulated Order, ECF No. 446.) The settlement, however, remained contingent upon Court approval. (*Id.*) Furthermore, the Muir Defendants, whose liability in this action depends largely upon the FTC's common enterprise theory, were notably absent from the settlement. (*Id.;* Complaint ¶¶ 16, 19, 25, ECF No. 1; Muir Objection 2:1–16, ECF No. 541.)

On September 30, 2013, before the Court had approved the settlement with the Settling Defendants, the FTC moved for summary judgment on Counts I–IV against all Defendants. (FTC's Mot. Summary Judgment p. 1, ECF No. 454.) That same day, the Lending Defendants filed their own motion seeking summary judgment on Count III, which was joined by the other Defendants. (Lending Defendants' Mot. Summary Judgment, ECF No. 461; Joinders, ECF Nos. 462–63, 465–66, 470–71.) Then on October 8, 2013, the Court approved the stipulated settlement of Counts II & IV with the Settling Defendants. (Order pp. 1–13, ECF No. 478.) Subsequently, on November 4, 2013, the FTC withdrew its motion for summary judgment on Counts II & IV against the Settling Defendants, but not the Muir Defendants. (Withdrawal Motion p. 2, ECF No. 487.)

The FTC's Motion for Summary Judgment on Counts I & III against all Defendants, and Counts II & IV against the Muir Defendants (ECF Nos. 454, 487) and the Lending Defendants' Motion for Summary Judgment on Count III (ECF No. 461) were referred to Magistrate Judge Ferenbach pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Nevada Local Rule IB 1–4. On January 28, 2014, Judge Ferenbach recommended that this Court enter an order granting the FTC's Motion for Summary Judgment on Counts I & III against all Defendants and denying without prejudice the motion on Counts II & IV against the Muir Defendants as well as denying the Lending Defendants' Motion for Summary Judgment on Count III. (Report & Recommendation, ECF No. 539.) Judge Ferenbach further recommended that the Bifurcation Order be amended to permit Counts II & IV to proceed against the Muir Defendants during Phase II. (*Id.*)

## II. *LEGAL STANDARD*

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1–4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3–2. Upon the filing of such objections, the Court must make a de novo determination of those portions of the Report to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3–2(b).

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1207 (9th Cir.2008) (citing *United States v. Shumway,* 199 F.3d 1093, 1103–04 (9th Cir.1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. 2548. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Objection of the Lending Defendants

In their Objection (ECF No. 542), the Lending Defendants—joined by the other

Defendants—assert that Judge Ferenbach erred in his Report and Recommendation (ECF No. 539) by applying an incorrect legal standard, by improperly treating fact questions as questions of law, and by violating the summary judgment standard in resolving disputes of material fact in the FTC's favor. (Objection 1:9–14, ECF No. 542.) Specifically, Defendants assert that Judge Ferenbach erred (1) by treating the net impression of Defendants' loan documents as a question of law instead of fact, (2) by ignoring facts as immaterial that are favorable to Defendants, (3) by "inventing new theories" as to why the loan documents are ambiguous, (4) by misconstruing material facts in favor of the FTC, (5) by evaluating the TILA disclosure in a manner contrary to Ninth Circuit case law, (6) by applying the incorrect test for contractual ambiguity, and (7) by failing to grant summary judgment to Defendants. (*Id.* 1:15–2:6.) The first four objections relate to Judge Ferenbach's granting of summary judgment to the FTC on Count I while the final three objections relate to Judge Ferenbach's granting of summary judgment to the FTC on Count III. For the following reasons, each of these objections is without merit.

### 1. Treatment of the Net Impression of the Loan Documents

■ Section 5 of the Federal Trade Commission Act of 1914 prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Gill,* 265 F.3d 944, 950 (9th Cir.2001) (citing *F.T.C. v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir.1994)). Actual deception is not required for a Sec-

tion 5 violation. *Trans World Accounts, Inc. v. F.T.C.,* 594 F.2d 212, 214 (9th Cir. 1979). Rather, Section 5 "only requires a showing that misrepresentations 'possess a tendency to deceive.'" *F.T.C. v. Commerce Planet, Inc.,* 878 F.Supp.2d 1048, 1073 (C.D.Cal.2012) (quoting *Trans World Accounts, Inc.,* 594 F.2d at 214). Furthermore, the Court considers "the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading," and a Section 5 violation may still be found even if the fine print and legalese were technically accurate and complete. *Commerce Planet,* 878 F.Supp.2d at 1063 (citing *Gill,* 265 F.3d at 956)); *see also F.T.C. v. Cyberspace.Com LLC,* 453 F.3d 1196, 1200 (9th Cir.2006) (stating that a representation "may be likely to mislead by virtue of the net impression it creates even though the [representation] also contains truthful disclosures").

■ Defendants' first objection is that Judge Ferenbach erred by "improperly step[ping] into the shoes of the fact-finder" and treating the net impression of the Loan Note and Disclosure document as a question of fact instead of law. (Objection 3:8–19, ECF No. 542.) Defendants assert that the Ninth Circuit and District of Nevada cases granting summary judgment to the FTC for Section 5 claims are distinguishable from this case because in those cases the Court found that no genuine issues of material fact existed. (*Id.* 4:1–9) (citing *FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir.2009); *Cyberspace.Com LLC,* 453 F.3d at 1201; *Gill,* 265 F.3d at 955–56; *FTC v. Publishers Bus. Servs., Inc.,* 821 F.Supp.2d 1205, 1226 (D.Nev.2010); *FTC v. Grant Connect, LLC,* 827 F.Supp.2d 1199, 1219 (D.Nev.2011)).

Defendants' argument, however, is unpersuasive. First, numerous Ninth Circuit

cases, including the ones cited by Defendants have found the net impression of a representation to be suitable for summary judgment determination. *See e.g. Cyberspace.Com LLC,* 453 F.3d at 1201 ("[T]he district court properly granted summary judgment to the FTC on the FTCA § 5 violation because no reasonable factfinder could conclude that the solicitation was not likely to mislead consumers acting reasonably under the circumstances in a way that is material."); *F.T.C. v. Gill,* 71 F.Supp.2d 1030, 1035 (E.D.Cal.1999), *aff'd,* 265 F.3d 944 (9th Cir.2001) ("Where the operative facts are substantially undisputed, and the heart of the controversy is the legal effect of such facts, such a dispute effectively becomes a question of law that can, quite properly, be decided on summary judgment."). Second, as will be addressed in the next section of this opinion, Judge Ferenbach correctly found that there are no genuine issues of material fact regarding the terms Loan Note Disclosure and no reasonable factfinder could conclude that the document was not likely to mislead consumers. *See Infra* § III.A.2. Therefore, Judge Ferenbach did not improperly supplant the role of the jury in determining the net impression of the Loan Note Disclosure. Defendants' objection is without merit.

### 2. Ignoring as "Immaterial" Facts Favorable to Defendants

■ Defendants' second objection is that in conducting his "likely to mislead" analysis, Judge Ferenbach failed to follow the appropriate summary judgment standard by ignoring all the evidence that was favorable to Defendants and drawing all factual inferences in favor of the FTC. (Objection 7:15–24, ECF No. 542.) In support of this objection, Defendants argue that the facts ignored by Judge Ferenbach, such as Defendants' expert testimony, show the Loan Note Disclosure was

not misleading. (*Id.* 8:4–13:24.) Defendants' also reorganize and explain the terms of the document in an attempt to show that the TILA Box and fine print are consistent and that the terms contained in the fine print of the document are not hidden, vague, uncertain, or contradictory. (*Id.*)

This argument, however, misunderstands the law and Judge Ferenbach's analysis and was directly addressed and refuted in the Report and Recommendation. (Report & Recommendation 22:11–26:18, ECF No. 539.) First, the terms of the Loan Note Disclosure are not disputed by Defendants. *See e.g.* (Defendants' Opposition 11:1–26, ECF No. 493.) Second, Judge Ferenbach noted that the terms of the TILA Box and the fine print of that document provide the basis for his finding that Defendants violated Section 5 of the FTC Act. (Report & Recommendation 23:4–6, ECF No. 539.) Therefore, any facts other than the terms of the Loan Note Disclosure and their presentation in the document are immaterial to a summary judgment determination. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *see also* (Report & Recommendation 24:17–26:18, ECF No. 539) (addressing in detail why each of Defendants' factual disputes are immaterial).

Furthermore, Defendants' presentation and explanation of the fine print terms fail to show that Judge Ferenbach erred in finding that the Loan Note Disclosure was likely to mislead as a matter of law. The Loan Note and Disclosure document's net impression is likely to mislead because of the way the terms are presented to borrowers by the document, not because Defendants' counsel can pull out the important terms and rearrange them in large

bullet point lists that allow for a clearer understanding of their effects. *See Feil v. F.T.C.*, 285 F.2d 879, 887 n. 18 (9th Cir. 1960) ("The law is not made for experts but to protect the public,—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impression.") (quoting *Aronberg v. F.T.C.*, 132 F.2d 165, 170 (7th Cir.1943)); *Cyberspace.Com LLC*, 453 F.3d at 1200 ("A [representation] may be likely to mislead by virtue of the net impression it creates even though the [representation] also contains truthful disclosures."); (Report & Recommendation 10:14–18, ECF No. 539) ("[A]rguments about the technicalities of the loan note's provisions, qualifications, and disclaimers are misplaced. Even if an argument regarding the loan note is technically true in the mind of an attorney, the argument is immaterial under Rule 56 if it is not also true in the eyes of a 'reasonable' borrower."). The test for a FTC Act violation is whether the representation "is likely to mislead consumers acting reasonably under the circumstances." *Pantron I Corp.*, 33 F.3d at 1095.

As Judge Ferenbach correctly found, the net impression of the Loan Note Disclosure is likely to mislead borrowers acting reasonably under the circumstances because the large prominent print in the TILA Box implies that borrowers will incur one finance charge while the fine print creates a process under which multiple

finance charges will be automatically incurred unless borrowers take affirmative action. (Report & Recommendation 16:17–19, ECF No. 539) ("It requires no citation of authority to demonstrate that the 'net impression' of a boldfaced representation, which states that the borrower is responsible to repay a fixed sum, is misleading when the fine print indicates that the boldfaced fixed sum is not fixed."); *see Commerce Planet, Inc.*, 878 F.Supp.2d at 1065 ("the information about the continuity plan ... is buried with other densely packed information and legalese, which makes it unlikely that the average consumer will wade through the material and understand that she is signing up for a negative option plan.") This structure gives the impression that a $300.00 loan from the Lending Defendants will only cost borrowers $90.00, when in fact, unless borrowers read the fine print and take the necessary steps to opt out of the renewal plan, such a loan will incur $675.00 in fees.

Furthermore, the material terms in the fine print are arranged in the document in such a way that the existence of the automatic renewal and the process for declining renewal are hidden from borrowers. *See Supra* 4:1–18 (reproducing the Loan Note Disclosure). These terms, which significantly alter the parties' legal obligations from what is implied by the terms in the TILA Box, are concealed from borrowers because they are scattered throughout the fine print in the document and because the terms never expressly state that the renewal plan is automatic.[10]

---

**10.** Perhaps the most telling evidence that the important terms in the Loan Note Disclosure are hidden by their scattered presentation in the fine print is provided by Defendants' own counsel. In the portion of their Opposition arguing that the process for declining renewal is not hidden, Defendants' counsel listed nine bulleted terms that allegedly advise borrowers about the automatic nature of the renewal

process. (Defendants' Opposition 9:4–10–5, ECF No. 493.) As pointed out by the FTC, however, only five of the listed terms are actually contained in the Loan Note Disclosure document and, if numbered as they are listed by Defendants' counsel, those five terms appear in the Loan Note Disclosure in the order 2, 3, 5, 1, 6. (Resp. to Opposition 17:5–18:9, ECF No. 556.) Furthermore, all of

(*Id.*) Instead, the Loan Note Disclosure merely uses phrases implying automatic enrollment, such as that "1 payment [will be due] if you decline the option of renewing your loan." [11] (*Id.*)

Therefore, Defendants' factual disputes are immaterial and no reasonable jury could find that the Loan Note Disclosure was not likely to mislead borrowers acting reasonably under the circumstances. This objection is without merit.

### 3. Provision of Additional Reasons why the Loan Documents are Ambiguous

Defendants' third objection is that Judge Ferenbach violated Federal Rule of Civil Procedure 56(f) by granting summary judgment to the FTC after "invent[ing] a new theory" never advanced by the FTC that the Loan Note Disclosure's net impression is misleading because it is unclear under its terms how a borrower may opt out of the renewal plan.[12] (Objection 10:19–23, ECF No. 542.)

 It is true that a district court may grant a summary judgment motion "on grounds not raised by a party" only "[a]fter giving [the nonmovant] notice and a reasonable time to respond." Fed. R.Civ.P. 56(f). However, while the FTC may not have specifically argued that this particular ambiguity pointed out by Judge Ferenbach contributed to the misleading net impression of the Loan Note Disclosure, the FTC repeatedly argued in its motion that summary judgment was appropriate because of the "inconspicuous, contradictory, confusing, and vague language" in the document. (FTC's Memo in Supp. of MSJ 1:20–21, ECF No. 456); *see e.g.* (*id.* 19:6–7) ("the loan documents were confusing, particularly on the issue of the repayment terms"). Judge Ferenbach's citing of a particular example of the confusing and contradictory terms argued by the FTC as a basis for their motion does not constitute a ruling on grounds not raised by the moving party under Federal Rule of Civil Procedure 56(f). *See Ervco, Inc. v. Texaco Ref. & Mktg., Inc.*, 422 F.Supp.2d 1084, 1086 (D.Ariz.2006) ("Notice is not required if the issue on which the summary judgment was granted is a subset of the larger issue raised by the party.") (citing *Intel Corp. v. Hartford Accident and Indemnity Co.*, 952 F.2d 1551, 1556 (9th Cir.1991)). Therefore, this objection is without merit.

### 4. Interpretation of the Facts

Defendants' fourth objection is that "the Report misconstrues or misunderstands numerous material facts, always in ways favoring the FTC." (Objection 1:23–24, ECF No. 542.) The three examples of "material facts" cited by Defendants that Judge Ferenbach is alleged to have misconstrued are that: (1) The Loan Note

these terms except 1 and 6 are separated from the next relevant term by unrelated fine print. (*Id.*)

**11.** Buried in the seventeenth sentence of the Loan Note Disclosure's block of fine print is the statement: "This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed." *See Supra* 4:1–18 (reproducing the Loan Note Disclosure). This statement is the closest the Loan Note Disclosure comes to clearly expressing the automatic nature of the renewal plan, and notably, it is the first bullet point in Defendants' counsel's list of terms that are "not hid[den]." (Defendants' Opposition 9:3–13, ECF No. 493.)

**12.** This ambiguity arises from two statements in the Loan Note Disclosure, which alternatively provide that a borrower may opt out by the email-hyperlink procedure or by "tell[ing]" the Lending Defendants that he or she wishes to opt out. *See supra* note 8.

Disclosure link is not buried or inconspicuous because it is also displayed at the top of the webpage, (2) the words under the TILA Box are not "fine" because they are the same size as the rest of the disclosures, and (3) borrowers did not need to click the nine separate hyperlinks to read all the loan documents because all the documents were contained on the same webpage and only required scrolling up and down. (*Id.* 17:4–17.)

 Defendants' assertions that Judge Ferenbach erred in interpreting these three facts are misleading and irrelevant. Regarding the first example, Judge Ferenbach noted that the Loan Note Disclosure link appearing next to the mandatory check boxes, which would naturally draw a borrower's attention, was inconspicuous because it was buried in the fourth paragraph and overshadowed by two all caps hyperlinks. (Report & Recommendation 3:10–23, ECF No. 539.) This observation is true and unrefuted by Defendants. The fact that another link to the Loan Note Disclosure may have been placed at another location on the webpage far away from the check boxes is irrelevant and does not invalidate Judge Ferenbach's observation. Likewise, Judge Ferenbach's use of the phrase "fine print" to describe the 628 words appearing below the TILA Box is accurate, notwithstanding Defendants' argument that they are the same size as the text in the rest of the document, because the 628 words are grouped in one large block of small print while the TILA Box disclosures are bolded and surrounded by eye-catching white space. *See* BLACK'S LAW DICTIONARY 709 9th ed.2009) ("fine print. (1951) The part of an agreement or document—usu. in small, light print that is not easily noticeable—referring to disclaimers, restrictions, or limitations."). Finally, the fact that the nine separate hyperlinks lead to the loca-

tion of each loan document on one webpage rather than separate webpages with one document on each is irrelevant to Judge Ferenbach's point that the large number of links presented to borrowers as containing the loan documents discourages them from reading the documents. *See* (Report & Recommendation 3:10–23, ECF No. 539) ("Defendants' webpage facilitates borrowers not reading Defendants' terms and conditions."). Therefore, this objection is without merit.

**5. Evaluation of the TILA Disclosures**

 "[TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998). These mandated terms must be disclosed "clearly and conspicuously" to borrowers before the credit is extended. 12 C.F.R. § 1026.17(a)-(c). Furthermore, TILA requires "absolute compliance by creditors." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1199 (9th Cir.2010) (citations omitted). "[B]ecause TILA is liberally construed in favor of the consumer and strictly enforced against the creditor ... any misleading ambiguity ... should be resolved in favor of the consumer." *Id.* at 1202 (internal quotations omitted).

Defendants' fifth objection is that Judge Ferenbach ignored binding Ninth Circuit precedent in determining that the Loan Note Disclosure was ambiguous in the abstract rather than determining the technical question of whether the Loan Note Disclosure complied with TILA. (Objection 19:14–22:7, ECF No. 542.) Defendants rely entirely on the Ninth Circuit's ruling in *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114 (9th Cir.2009) for the propo-

sition that courts may not "engage ... in an abstract inquiry into whether any part of the Loan Note [Disclosure] is 'ambiguous.'" (*Id.* 19:25–28.)

██ Defendants, however, are the ones who appear to be ignoring binding Ninth Circuit precedent as their argument based on *Hauk* has been explicitly rejected by the Ninth Circuit. In *Hauk,* the Ninth Circuit denied a plaintiff's claims under TILA based upon ambiguous or misleading language in a provision that was not a disclosure governed by TILA or Regulation Z. *Hauk,* 552 F.3d at 1121–22. In *Rubio v. Capital One Bank,* the Ninth Circuit clarified that "*Hauk* did not condone misleading disclosures. It simply rejected the argument that TILA liability could be based on disclosures that were misleading about anything at all—what it called misleading in the abstract." *Rubio,* 613 F.3d at 1200 (internal quotations omitted). By contrast, the Ninth Circuit found in *Rubio* that disclosures which are required under TILA must be clear and conspicuous, and such a "disclosure that is not 'clear and conspicuous' is *ipso facto* misleading." *Id.*

The misleading disclosures at issue here—the finance charge, APR, total of payments, and payment schedule—are the very ones mandated by TILA. 12 C.F.R. § 1026.18(d)-(e), (g)-(h). Therefore, Judge Ferenbach did not ignore binding Ninth Circuit precedent in finding that the Loan Note Disclosure was ambiguous and in violation of TILA. (Report & Recommendation 30:4–6, ECF No. 539) ("Because Defendants' loan note is ambiguous as a matter of law, 'the terms of the legal obli-

gation between the parties' were not 'clearly and conspicuously' disclosed, as TILA requires."). Defendants' objection is without merit.

### 6. Ambiguity in TILA Mandated Terms

Defendants' sixth objection is that Judge Ferenbach failed to use the correct test for contractual ambiguity in finding that the ambiguities in the Loan Note Disclosure violated TILA. (Objection 2:1–2, ECF No. 542.) In support of this objection, Defendants assert that the proper "hornbook test" for ambiguity in this case is "whether the Loan Note [Disclosure] may reasonably be read as creating an obligation to renew as opposed to the single-payment obligation reflected in the TILA disclosures." [13] (*Id.* 19:6–8.) Defendants then assert that under this standard the TILA mandated terms in the Loan Note Disclosure were not ambiguous because the "single-payment option" was "clearly disclosed" and borrowers were not legally required to follow the renewal plan. (*Id.* 19:8–14, 22:9–25:22.)

██ Defendants' argument here is unpersuasive. A contract is ambiguous if it is "reasonably susceptible" to more than one interpretation. *Skilstaf, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1015 (9th Cir.2012); *see also* 11 WILLISTON ON CONTRACTS § 30:5 (stating the same). In its analysis of FTC Act violations, this Court has already determined that the terms in the Loan Note Disclosure regarding the automatic renewal plan were likely to mislead because they implied in the prominent TILA Box that only one finance

---

**13.** Defendants provide no legal citation for this "test," though they do later cite *Williston on Contracts,* for the proposition that, "as a matter of contract law, performance (like renewal) that either party may decline is not a legal obligation." 1 WILLISTON ON CONTRACTS

§ 1:2 (4th ed. 2010) (The actual quote is: "[A]n understanding that leaves an essential element of a promise open for future negotiation and agreement, constitutes no promise, and creates no legal obligation until the future agreement is actually made.").

charge would be incurred while the fine print created a process under which multiple finance charges would be automatically incurred unless borrowers take affirmative action. *See supra* § III.A.2. Those terms are therefore also ambiguous because a reasonable borrower could think the information prominently displayed in the TILA Box accurately reflected his or her legal obligations without needing to undertake any additional action, even if such a reading is not technically accurate. *Rubio,* 613 F.3d at 1202 (citing *Rossman v. Fleet Bank (R.I.) Nat. Ass'n,* 280 F.3d 384, 394 (3d Cir.2002)) ("any misleading ambiguity—any disclosure that a reasonable person could read to mean something that is not accurate—'should be resolved in favor of the consumer.'"). Furthermore, an ambiguous disclosure is necessarily not clearly and conspicuously disclosed.[14] *See id.* ("it is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *see also Watts v. Key Dodge Sales, Inc.,* 707 F.2d 847, 852 (5th Cir.1983) ("the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley,* 772 F.2d 815, 817 (11th Cir.1985) ("these divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation Z."). This objection is without merit.

### 7. Failing to Grant Defendants' Motion for Summary Judgment

Defendants' seventh objection is that Judge Ferenbach erred by failing to grant Defendants' summary judgment on Count III. (Objection 2:3–6, ECF No. 542.) As the Court has already found that Judge Ferenbach did not err in granting summary judgment for the FTC on Count III, this objection is without merit.

### B. Limited Objection of the Muir Defendants

In their Limited Objection (ECF No. 541), the Muir Defendants assert that Judge Ferenbach erred in his Report and Recommendation by only denying summary judgment against the Muir Defendants on Counts II & VI while granting the FTC summary judgment against the Muir Defendants on Counts I & III. (Limited Objection 3:23–4:10, ECF No. 541.)

Under the Bifurcation Order, no discovery regarding the Muir Defendants' liability for any of the counts alleged in the Complaint would occur until Phase II of the litigation. (Bifurcation Order p. 10, ECF No. 296); (Report & Recommendation 34:3–6, ECF No. 539.) As a result, discovery during Phase I regarding the alleged violations underlying the claims was effectively left to the Lending Defendants. *See* (Stip. to Withdraw Discovery Requests, ECF No. 278) (where the Muir Defendants and the FTC agree to withdraw pending discovery requests and postpone future discovery against each other until Phase II of the litigation). However, all discovery regarding Counts II & IV ceased when the FTC and the Settling Defendants reached a settlement agreement on those two counts, even though the settlement did not include the Muir Defendants and explicitly did not resolve the

---

**14.** The Court also notes that even if the terms were not ambiguous, the disclosures relating to the automatic entry of a loan into the renewal plan were not clear and conspicuous as they were buried in fine print. *See supra* § III.A.2; *see also Barrer v. Chase Bank USA, N.A.,* 566 F.3d 883, 892 (9th Cir.2009) ("Clear and conspicuous disclosures, therefore, are disclosures that a reasonable cardholder would notice and understand.... [T]he change-in-terms provision ... is buried too deeply in the fine print for a reasonable cardholder to [notice].")

FTC's claims against the Muir Defendants on Counts II & IV. (Order Granting Stipulated Motion ¶ 4, ECF No. 478) ("This settlement does not settle and resolve any conduct not alleged in Counts II and IV of the Complaint *or as to any other party.*") (emphasis added). Therefore, while the Muir Defendants remained potentially liable for Counts II & IV, discovery had not been effectively completed on those counts at the time of the FTC's Motion for Summary Judgment.

In the Report and Recommendation, Judge Ferenbach granted the FTC summary judgment against all Defendants, including the Muir Defendants, on Counts I & III. (Report & Recommendation 35:16–18, ECF No. 539.) However, because the Bifurcation Order and settlement agreement had effectively prevented the Muir Defendants from conducting discovery at the time the motion for summary judgment was filed, Judge Ferenbach recommended denying summary judgment on Counts II & IV and amending the Bifurcation Order to permit those claims to proceed during Phase II. (*Id.* 35:1–36:5) (citing Fed.R.Civ.P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it.")).

The Muir Defendants assert that granting summary judgment on Counts I & III effectively "nullified" the protections afforded under the Federal Rules of Civil Procedure that necessitated denying summary judgment on Counts II & IV. (Limited Objection 3:23–4:10, ECF No. 541.) The Muir Defendants further assert that the Bifurcation Order and Judge Ferenbach's "inconsistent ruling" denied them of their fundamental right to engage in discovery about the claims against them. (*Id.* 4:23–5:8.)

The Muir Defendants assertions, however, are unpersuasive. In contending that they were denied the right to engage in discovery and that Judge Ferenbach's Report and Recommendation is inconsistent in granting summary judgment on Counts I & III while denying it on Counts II & IV, the Muir Defendants appear to ignore two important facts. First, the Muir Defendants voluntarily chose to postpone discovery until after Phase I by stipulation (ECF No. 278) and no doubt benefited from being relieved from the costs involved in conducting that discovery. Second, the situation regarding Counts I & III is fundamentally different from the situation regarding Counts II & IV. Unlike Counts II & IV, which were not fully litigated by the Lending Defendants, full discovery and litigation was conducted by the Lending Defendants on Counts I & III, as was originally contemplated by all parties—including the Muir Defendants—in the Bifurcation Order. *See* (Bifurcation Order, ECF No. 296); (Stip. to Withdraw Discovery Requests, ECF No. 278). With respect to Counts I & III, the Muir Defendants are in the same position as all the other Defendants who allowed the Lending Defendants to take the lead in Phase I. Therefore, the Muir Defendants' rights to discovery and litigation of the claims in Count I & III were voluntarily given to and adequately protected by the Lending Defendants, while those rights with respect to Counts II & IV were not protected by the Lending Defendants due to their separate settlement.

It was for precisely this reason that Judge Ferenbach denied summary judgment on Counts II & IV while granting it on Counts I & III. (Report & Recommendation 35:1–4, ECF No. 539) ("In light of the Settling Defendants' not opposing summary judgment on counts two and four, the court must deny the FTC's mo-

tion for summary judgment on counts two and four in order to ... afford the Muir Defendants an opportunity to conduct discovery and litigate the relevant claims and defenses."). Judge Ferenbach's recommendation to grant summary judgment against the Muir Defendants on Counts I & III while denying it on Count II & IV, would prevent the Muir Defendants from improperly relitigating issues while ensuring their right to engage in discovery and litigation on those claims which were not adequately protected by the Lending Defendants. Therefore, the Muir Defendants' objection is without merit, and the recommendation of Judge Ferenbach regarding summary judgment against the Muir Defendants and amendment of the Bifurcation Order is adopted by the Court.

## IV. *CONCLUSION*

**IT IS HEREBY ORDERED** that the Report and Recommendation (ECF No. 539) is **ACCEPTED and ADOPTED** in full, to the extent it is not inconsistent with this opinion.

**IT IS FURTHER ORDERED** that the FTC's Motion for Summary Judgment (ECF No. 454) is **GRANTED in part and DENIED in part.** The FTC's Motion for Summary Judgment is **GRANTED** on Count I and Count III. The FTC's Motion for Summary Judgment is **DENIED without prejudice** on Count II and Count IV.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 461) is **DENIED.**

**IT IS FURTHER ORDERED** that the Bifurcation Order is amended to permit Count II and Count IV to proceed against the Muir Defendants during Phase II of the litigation.

## *REPORT & RECOMMENDATION*

CAM FERENBACH, United States Magistrate Judge.

(Plaintiff's motion for summary judgment (# 454); Defendants' motion for summary judgment (# 461))

The Federal Trade Commission commenced this civil enforcement action regarding the offer and sale of "high-fee, short-term payday loans." (First Amend. Compl. (# 386) at ¶ 1 [1]). In pertinent part, the FTC's complaint alleges that Defendants violated the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the Truth in Lending Act, 15 U.S.C. § 1601, by misrepresenting the terms on which credit was extended to short-term borrowers. Before the court are the FTC's and the Lending Defendants' motions for summary judgment. (Pl.'s Mot. Summ. J. # 454); (Def.'s Mot. Summ. J. # 461). Joinders, oppositions, and replies, have been filed.[2] For the reasons stated below, the court grants the FTC's motion for summary judgment on counts one and three, denies the FTC's motion for summary judgment on counts two and four, and denies Defendants' motion for summary judgment in its entirety.

## BACKGROUND [3]

The Federal Trade Commission's ("FTC") action is predicated on thousands

---

**1.** Parenthetical citations refer to the court's docket.

**2.** The following joinders have been filed: (Def. Brady # 461), (Def. LittleAxe # 465), (Tucker Defs. # 466), (Def. Campbell # 470), (Muir Defs. # 471). The following oppositions have been filed: (Def.'s Opp'n # 493),

(Muir Defs. # 490), (Pl.'s Opp'n # 491). The following replies have been filed: (Pl.'s Reply # 514), (Def.'s Reply # 512); (Def. LittleAxe's Joinder to Reply # 520).

**3.** Because the facts must be viewed in the light most favorable to the nonmoving party, the following facts are taken from Defendants'

of complaints by short-term borrowers and former employees of the short-term lenders. The complaints were submitted to the FTC, the Better Business Bureau, and various state-run consumer protection agencies. (*See* Pl.'s Opp'n (# 517) at 15:13–14). The FTC investigated these complaints and filed suit on April 2, 2012 against eighteen Defendants. (*See* Compl. # 1). For purposes of the motions before the court, the relevant facts include: (1) the application process borrowers completed to obtain loans; (2) the repayment process Defendants created; and (3) the court's entry of its bifurcation order. Each is discussed below.

## I. *The Application Process*

Defendants MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc. (collectively, "the Lending Defendants") offer short-term payday loans through Defendant AMG Services, Inc. (Def.'s Opp'n (# 493) at ¶ 1). AMG Services provides the Lending Defendants with staff, call centers, and the various websites through which the Lending Defendants sell their loans. (*Id.*) Although Defendants' various websites differ in appearance, all provide the same information to borrowers in the same language. (*Id.*) This means that all of Defendants' loan notes and other documents are "identical." (*Id.*)

Borrowers obtain loans by completing an application, which requests the borrower's personal, employment, and financial information. (*Id.* at ¶ 2). Personal information includes the borrower's name, date of birth, contact information, and two personal references. (*Id.* at ¶ 3). Employment information includes the name and contact information of the borrower's employer. (*Id.*) Financial information includes

the borrower's bank account number and routing number. (*Id.*) This enabled Defendants to automatically withdraw funds from borrowers' accounts.

Once the application is finished, Defendants determine the maximum amount that can be borrowed and a repayment date. (*Id.*) When this is completed, a new webpage appears that reads: "CONGRATULATIONS! [Defendant] has Pre-Approved you for up to: $300." (*Id.* at ¶ 4). The borrower is, then, prompted to select the amount he or she wants to borrow from a dropdown box on Defendants' website. (*Id.* at ¶ 4). Depending on the individual's creditworthiness, Defendants permit borrowers to select an amount between $150.00 and $800.00. (*Id.* at ¶ 1). To receive loan proceeds, the borrower simply selects the desired amount from the dropdown box, clicks four boxes to accept Defendants' terms and conditions, types his or her name into an electronic signature box, and clicks a button that reads: "I AGREE Send Me My Cash!" (*Id.*)

Defendants do not require borrowers to read their loans' terms and conditions before receiving money. (*See generally id.*) On the contrary, Defendants' webpage facilitates borrowers not reading Defendants' terms and conditions. To read the terms and conditions, the borrowers must click nine separate hyperlinks that are in eight or nine point font:

■ I have read and accept the terms of the *Application*, including the terms and provisions of the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION* contained therein.

☑ I have read and accept the terms of the *Privacy Policy & Electronic Disclosure and Consent Agreement*.

filings unless otherwise stated. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ I have read and accept the terms of the *Authorization Agreement.* ·

☑ I have read and accept the terms of the *Loan Note and Disclosure,* including the terms and provisions of the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION* contained therein.[4]

The most important of the nine links listed in the four rows is the least conspicuous: the *Loan Note and Disclosure.* The loan note and disclosure link is buried in the fourth paragraph and overshadowed by two redundant links to the *LIMITED WAIVER OF SOVEREIGN IMMUNITY* and the *ARBITRATION PROVISION.* (*See id.* at ¶ 4). If a borrower clicks on the *Loan Note and Disclosure* link, the following document appears. As depicted below, the *Loan Note and Disclosure* consists of a Truth in Lending box (*i.e.,* "TILA box") and 749 words in fine print that contains two obscure footnotes and is divided by a box:

## LOAN NOTE AND DISCLOSURE

**Borrower's Name:** _____

***Parties:*** In this Loan Note and Disclosure ("Note") you are the person named as Borrower above. "We" Ameriloan are the lender (the "Lender").

All references to "we", "us" or "ourselves" mean the Lender. Unless this Note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide to us shall be provided to Ameriloan at the fax number and address specified in this Note and in your other loan documents.

***The Account:*** You have deposit account, No \* \* \* \* \* \* \* \* \* \* *5844 ("Account"), at First Arkansas Bank and Trust ("Bank"). You authorize us to effect a credit entry to deposit the proceeds of the Loan (the Amount Financed indicated below) to your Account at the Bank.

***DISCLOSURE OF CREDIT TERMS:*** The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate (e) | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made the scheduled payment |
| 684.38% | $90.00 | $300.00 | $390.00 |

Your **Payment Schedule** will be: 1 payment of $390.00 due on 2010–09–24, if you decline\* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010–09–24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. \*To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured.
**Prepayment:** *You may prepay your loan only in increments of $50.00.* If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is 9–8–2010.
*Itemization Of Amount Financed of $300.00;* **Paid on your account** *$0*
See below and your other contract documents for any additional information about prepayment, nonpayment and default.

**Promise to Pay:** You promise to pay to us or to our order and our assignees, on

---

**4.** As depicted in Defendants' filings, underlining signifies hyperlinks. (*See id.* at ¶ 4).

the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge show above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

(*See* Pl.'s Mot. Summ. J. (# 456) at 10:4 – 12) (reproducing this exact loan note); (*see also* Def.'s Opp'n (# 493) at ¶ 7) (reproducing a loan note from OneClickCash with the same exact provisions); (*see also* Def.'s Mot. Summ. J. (# 461) at 5:11–22) (reproducing a loan note from USFastCash with the same exact provisions).

## II. *The Repayment Process*

Provided that borrowers satisfied certain conditions precedent, borrowers who obtained loans from Defendants were only obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (*See, e.g.*, Def.'s Reply (# 512) at 7:1–15). However, if borrowers did not satisfy the conditions precedent, they were no longer able to satisfy their obligation by repaying the fixed amount in the TILA box. (*Id.*) Instead, they were automatically enrolled in a costly ten pay-period "renewal" plan. (*Id.*) Under the terms of the renewal plan, multiple finances charges are incurred and the borrower's principal balance only decreases by $50.00 a pay period after the fourth payday. (Def.'s Opp'n (# 493) at 12–13).

For instance, if a borrower obtained a $300.00 loan from Defendants, and did not act to "decline the option of renewal," his or her "total or payments" would not be $390.00, as disclosed in the TILA box. Rather, the borrowers would be automatically enrolled in the following payment schedule:

| PAYDAY | PAYMENT | FINANCE CHARGE (30% OF REMAINING PRINCIPAL BALANCE) | AMOUNT APPLIED TO PRINCIPAL | REMAINING PRINCIPAL BALANCE | TOTAL PAID TO DATE |
|---|---|---|---|---|---|
| 1 | $90.00 | $90.00 | $0.00 | $300.00 | $90.00 |
| 2 | $90.00 | $90.00 | $0.00 | $300.00 | $180.00 |
| 3 | $90.00 | $90.00 | $0.00 | $300.00 | $270.00 |
| 4 | $90.00 | $90.00 | $0.00 | $300.00 | $360.00 |
| 5 | $140.00 | $90.00 | $50.00 | $250.00 | $500.00 |
| 6 | $125.00 | $75.00 | $50.00 | $200.00 | $625.00 |
| 7 | $110.00 | $60.00 | $50.00 | $150.00 | $735.00 |
| 8 | $95.00 | $45.00 | $50.00 | $100.00 | $830.00 |
| 9 | $80.00 | $30.00 | $50.00 | $50.00 | $910.00 |
| 10 | $65.00 | $15.00 | $50.00 | $0.00 | $975.00 |
| TOTAL | $975.00 | $675.00 | $300.00 | - | $975.00 |

(*See* Def.'s Opp'n (# 493) at 13–16) (stipulating to these repayment terms); (*see also* Pl.'s Mot. Summ. J. (# 456) at 14:1–14) (reproducing an internal document from Defendants' containing this payment schedule).

Theoretically, borrowers could opt out of the automatic "renewal" plan, but the mechanism for opting out of renewal is ambiguous. One provision of the fine print states that borrowers may decline "renewal" if "you tell us you do not want to renew the Note." Alternatively, another provision states: "[t]o decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due."

In addition to being ambiguous, Defendants—and not the borrowers—maintained control over the mechanism for opting out of renewal. First, Defendants' construed the loan note so that the only way borrowers could decline renewal was through the confusing email-and-hyperlink procedure. (*See* Def.'s Opp'n (# 493) at 7:12–14; 14:15–16; 16:16–18) (citing an employee declaration, call script, and the email sent to borrowers from the lenders stating that there is only one procedure for opting out).

Second, Defendants established and controlled a convoluted procedure for opting out. To opt out, borrowers had to complete the following steps: (1) three days after the loan is funded, Defendants send an email to the borrower containing additional loan terms and a link that provides access to a webpage on the lender's website where the opt-out election can be made; (2) the borrower opens the email, reads the new terms,[5] accesses the webpage, and makes the appropriate selection

---

5. The new terms included in the email state that there are three repayment plans: (1) Renewal, which is depicted in the chart above; (2) Pay down, which involves paying down the principal in increments of $50.00; this option may only be exercised by submitting a request in writing by fax; and, (3) Full pay out, which involves paying a single finance charge plus the amount borrowed before the borrower's next pay day. (*See* Def.'s Opp'n (# 493) at 14:2–16) (reproducing a copy of the email describing the three repayment plans).

to opt-out; and, (3) the selection is executed three business days before the borrower's "loan is due." (*Id.* at 7:12–14).

This created confusion. Borrowers assumed that Defendants would automatically withdraw a lump sum after one pay period that was equal to one finance charge plus the amount borrowed. Instead, borrowers were automatically enrolled in the costly "renewal" plan, and Defendants automatically withdrew money from borrowers' accounts for ten pay periods.

Defendants received thousands of complaints from disgruntled customers. (*See* Pl.'s Mot. Summ. J. (# 456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints). For example, Susan Oxenford estimated that approximately eighty percent of the consumers she spoke with complained that Defendant had withdrawn more from their accounts than the loan cost. (Oxenford Depo. (# 455–113) at 170:18–172:10). Joshua Kendall similarly testified that more than half of the consumers with whom he spoke were confused about the loans' repayment terms. (Kendall Depo. (# 455–112) at 135:6–16). Finally, Sara Glass testified that more than half of the customer-service calls she received involved consumers not understanding how Defendants' loans worked. (Glass Depo. (# 455–75) at 105:7–22; 107:15–108:7; 185:16–186:21).

Internal documents indicate that Defendants' trained employees to deceive borrowers by concealing how the loans work. For instance, an email from Defendants' manager of Training and Development to one of Defendants' sales representatives stated: "When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan

after the explanation and I believe that a lot of it has to do with the way it is explained." (Email (# 456–72) at 1).

### III. *The FTC Files Suit & the Court Enters the Bifurcation Order*

The FTC filed suit on April 2, 2012 against eighteen Defendants. (*See* Compl. # 1). The FTC's complaint alleges claims for deceptive acts and practices (Count I) and deceptive collection practices (Count II) in violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC's complaint also alleges a claim under the Truth in Lending Act, 15 U.S.C. § 1601 (Count III), a claim under the Electronic Funds Transfer Act, 15 U.S.C. § 1693 (Counts IV), and a claim for disgorgement under the Federal Trade Commission Act, 15 U.S.C. § 53(b) (Count V).

On December 27, 2012, the court entered a stipulated preliminary injunction and bifurcation order. (Bifurcation Order (# 296) at 10). The bifurcation order divided the FTC's litigation into two phases: a liability phase and a relief phase. (*Id.* at 9–10). Under the terms of the bifurcation order, no discovery regarding any claims or defenses involving the Muir Defendants would occur until phase two. (*Id.*); (*see also* Muir Def.'s Opp'n (# 490) at 2).

On July 18, 2013, the following Defendants (hereinafter "the Settling Defendants") stipulated to settle counts two and four: AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc., MNE Services, Inc., Scott A. Tucker, Blaine A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, LeadFlash Consulting, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LCC, Don E. Brady, Robert D. Campbell, and Troy L. LittleAxe, Jr. (Stip. Mot. (# 446) at 1). The settlement was contingent on court approval.

On September 30, 2013, the FTC moved for summary judgment on all counts against all Defendants because the court had not yet approved the Settling Defendants' stipulated settlement. (Pl.'s Mot. Summ. J. (# 454) at 1).

On October 8, 2013, the court approved the Settling Defendants' stipulated settlement. (*See* Order (# 478) at 1–13).

Consequently, on November 4, 2013, the FTC withdrew its motion for summary judgment on counts two and four against the Settling Defendants, but not the Muir Defendants. (*See* Withdrawal Mot. (# 487) at 2).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Rule 56(a) provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). "Material facts" are facts that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249, 106 S.Ct. 2505 (citing 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93–95 (1983)). A dispute regarding material facts is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When determining whether there is a "genuine dispute" regarding "material facts," the court considers the "materials in the record." FED.R.CIV.P. 56(c)(1)(A). The court may also consider "the absence or presence" of disputed facts that are or are not in the record. FED.R.CIV.P. 56(c)(1)(B). The court's role is not to weigh the evidence, make credibility determinations, or determine the truth. *See Anderson,* 477 U.S. at 249, 255, 106 S.Ct. 2505. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. The purpose of summary judgment is twofold: (1) "to isolate and dispose of factually unsupported claims," and (2) to determine whether a case "is so one-sided that one party must prevail as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The court's role is limited to determining whether there is a genuine factual issue for trial. *Id.* at 249, 106 S.Ct. 2505.

If the moving party meets its initial burden, the burden shifts to the opposing party to set forth "specific facts showing that there is a genuine issue for trial." *F.T.C. v. Stefanchik,* 559 F.3d 924, 927 (9th Cir.2009) (citation omitted). "[B]ald assertions of a mere scintilla of evidence" are insufficient. *Id.* at 929 (citation omitted). However, the opposing party must demonstrate the existence of a factual dispute that "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987).

The Supreme Court has long held that summary judgment should be granted where the evidence "would require a directed verdict for the moving party." *Id.* at 251, 106 S.Ct. 2505 (citing *Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). The only difference between a motion for a directed verdict and a motion for summary judgment is procedural: "summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been

admitted." *Id.* (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)).

## DISCUSSION

This case is not about technicalities or whether either party's interpretation of the loan note is, in principle, correct. Rather, the relevant standard under the Federal Trade Commission Act, the Truth in Lending Act, and Regulation Z is one of "reasonableness." [6] This means that arguments about the technicalities of the loan note's provisions, qualifications, and disclaimers are misplaced. Even if an argument regarding the loan note is technically true in the mind of an attorney, the argument is immaterial under Rule 56 if it is not also true in the eyes of a "reasonable" borrower. (*See infra* § II.C.1 n. 14).

With this distinction in mind, the court turns to the parties' motions for summary judgment. The court's analysis of the parties' motions is divided into three parts: (1) whether the FTC is entitled to summary judgment on count one; (2) whether the FTC or Defendants are entitled to summary judgment on count three; and, (3) whether the court must deny the FTC's motion for summary judgment on counts two and four under Federal Rule of Civil Procedure 56(d). Each is discussed below.

### I. Count I: The FTC's Motion for Summary Judgment is Granted

The court finds that Defendants violated section 5 of the FTC Act because Defen-

dants misrepresented that borrowers will be obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (*See* First Amend. Compl. (# 386) at ¶¶ 47(b), 48(b)). The court's discussion regarding Defendants' violation of the FTC Act proceeds in three parts: (1) a review of section 5 of the FCT Act; (2) a finding that the FTC satisfied its initial burden demonstrating the absence of a genuine issue of material fact; and, (3) a finding that Defendants failed to satisfy their burden because the factual disputes proffered are immaterial and irrelevant.

### A. The Federal Trade Commission Act, 15 U.S.C. § 45(a)

Section 5 of the Federal Trade Commission Act of 1914 prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir.2001) (citing *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994)). This inquiry is governed by a standard of reasonableness. *See, e.g., Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir.1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003).

---

**6.** As discussed in more detail below, representations violate section 5 of the Federal Trade Commission Act if the a common sense "net impression" of the representations are likely to mislead "reasonable" customers. *See, e.g., Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir.1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir.2003). Similarly, disclosures violate Reg-

ulation Z of the Truth in Lending Act if they are not "clear and conspicuous" and "meaningful" or if they are "reasonably susceptible" to more than one interpretation. *See* 12 C.F.R. § 1026.17(a), (c); *Chase Bank USA, NA v. McCoy*, 562 U.S. 195, ——— ———, 131 S.Ct. 871, 874–75, 178 L.Ed.2d 716 (2011); *In re Whitley*, 772 F.2d 815, 815 (11th Cir.1985) (per curiam).

A section 5 violation does **not** require actual deception. *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212, 214 (9th Cir. 1979) (emphasis added). Rather, section 5 "only requires a showing that misrepresentations 'possess a tendency to deceive.'" *F.T.C. v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048, 1073 (C.D.Cal.2012) (quoting *Trans World Accounts, Inc.*, 594 F.2d at 214); *see also F.T.C. v. Colgate–Palmolive Co.*, 380 U.S. 374, 391–92, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) ("Nor was it necessary for the Commission to conduct a survey of the viewing public before it could determine that the commercials had a tendency to mislead.") (citation omitted).

This inquiry is governed by a standard of "reasonableness." *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir.1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003). Deception may be found based on the "net impression" created by a representation. *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir.2006). This means that the court employs its "common sense," and that a section 5 violation is not determined by fine print, technicalities, and legalese. *Commerce Planet*, 878 F.Supp.2d at 1063 (citing *Gill*, 265 F.3d at 956); *see also Cyberspace.Com LLC*, 453 F.3d at 1200 (stating that a representation "may be likely to mislead by virtue of the net impression it creates even though the [representation] also contains truthful disclosures"). "While proof that consumers actually were deceived is not required, such evidence is 'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'" *F.T.C. v. Grant Connect, LLC*, 827 F.Supp.2d 1199, 1215 (citation omitted).

For instance, in *Floersheim v. F.T.C.*, the Ninth Circuit held that the appearance and prominent repetition of the words "Washington D.C." on debt-collecting forms from a private collections company created the deceptive impression that the forms were a demand from the government even though the forms contained a small print disclaimer informing recipients that such was not the case. *Floersheim v. F.T.C.*, 411 F.2d 874, 876–78 (9th Cir.1969) (cited in *Cyberspace.Com LLC*, 453 F.3d at 1200). Similarly, in *F.T.C. v. Brown & Williamson Tobacco Corp.*, the D.C. Circuit affirmed a district court's finding that a representation regarding cigarette tar was deceptive even though fine print in the corner of the advertisement truthfully explained how the tar content was measured. *Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42–43 (D.C.Cir.1985) (cited in *Cyberspace.Com LLC*, 453 F.3d at 1200). The court reasoned that, under the circumstances, consumers were unlikely to read the fine print in the corner of the ad. *Id.* at 43. Likewise, in *F.T.C. v. Figgie International, Inc.*, the Ninth Circuit stated that there is "nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole." *Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir.1993).

## B. The FTC Satisfied its Burden of Demonstrating the Absence of a Genuine Issue of Material Fact regarding Count One

There is no "genuine issue of material fact" regarding count one. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Count one alleges that Defendants violated section 5 of the FTC Act by, *inter alia*, representing that "[a] consumer's total of payments will be equal to the amount financed plus a stated finance charge." (First Amend. Compl. (# 386) at ¶ 47(b)). In reality, however, undisputed facts show that "[t]he consumer's total of payments has been greater than the amount financed plus the

stated finance charge." (*Id.* at ¶ 48(b)). This misrepresentation satisfies the three elements of a section 5 violation. *See Gill,* 265 F.3d at 950 ("An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"). Each element is discussed below.

### 1. *"Representations" in Defendants' Loan Documents*

With regard to the first element, Defendants' loan note contains two sets of repre-sentations: the Truth in Lending (*i.e.,* "TILA") box and the fine print. The TILA box represents that borrowers are obligated to repay a fixed sum equal to the principal plus a single finance charge. (*See* First Amend. Compl. (# 386) at ¶ 35); (Pl.'s Summ. J. Mot. (# 456) at ¶ 26) (citing Exs. 19 & 20). For example, when a customer borrowed $300.00 from Defendants, the TILA box in Defendants' Loan Note stated:

**DISCLOSURE OF CREDIT TERMS:** The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate (e) | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made the scheduled payment |
| 684.38% | $90.00 | $300.00 | $390.00 |

(First Amend. Compl. (# 386) at ¶ 35) (emphasis original); (Pl.'s Summ. J. Mot. (# 456) at ¶ 26).

Fine print, however, immediately follows the TILA box. The fine print explains how the loan actually works. In the case of a $300.00 loan borrowed on approximately September 10, 2010, the fine print read:

Your **Payment Schedule** will be: 1 payment of $390.00 due on 2010–09–24, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010–09–24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. Security: The loan is unsecured.

**Prepayment:** You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is 9–8–2010.

**Itemization Of Amount Financed of $300.00; Paid on your account $0**

See below and your other contract documents for any additional information

about prepayment, nonpayment and default.

**Promise to Pay:** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge show above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

These terms contradict the terms disclosed in the TILA box. In plain English, the fine print means that: (1) the repayment amount is not fixed; (2) the borrower is automatically enrolled in a ten pay-period loan "renewal" plan; (3) the "renewal" plan imposes multiple finance charges; and (4) the "renewal" plan increases "the dollar amount the credit will cost you" from $90.00 to $675.00.

Additionally, the fine print also means that the borrower can only decline the "renewal" plan if the borrower completes the following three steps: (a) three days after the loan is funded, Defendants send an email to the borrower containing additional loan terms and a link that provides access to a webpage on the lender's website where the opt-out election can be made; (b) the borrower opens the email, reads the new terms,[7] accesses the webpage, and makes the appropriate selection to opt-out; and, (c) the selection is executed and the payment is received before 4:30 p.m., three business days before the bor-

---

7. As stated above, the new terms state that there are three repayment plans: (1) Renewal, which is depicted in the chart above; (2) Pay down, which involves paying down the principal in increments of $50.00; this option may only be exercised by submitting a request in writing by fax; and, (3) Full pay out, which involves paying a single finance charge plus the amount borrowed before the borrower's next pay day. (*See* Def.'s Opp'n (# 493) at 14:2–16) (reproducing a copy of the email describing the three repayment plans).

rower's "loan is due."[8] (Def.'s Opp'n (# 493) at 7:12–14).

The fine print not only contradicts terms disclosed in the TILA box, the fine print also contains provisions that contradict other provisions in the fine print. For instance, the fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." The fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure. Additionally, the fine print states that "[a]ny payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank," and that if the borrower revokes Defendants' ACH authorization, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

### 2. *Defendants' Representations were "Likely to Mislead" Borrowers*

With regard to the second element, Defendants' representations were "likely to mislead" because the loan note's "net impression" is misleading as a matter of law and the loan note is ambiguous as a matter of law. *See Gill,* 265 F.3d at 950 (identifying the second element for a section 5 violation as a representation that is "likely to mislead"). Both reasons are discussed below.

### i. *The loan note's "net impression" is likely to mislead*

The loan note's "net impression" is likely to mislead reasonable borrowers for six reasons. First, the TILA box presents a set of terms that is materially altered by the fine print. The TILA box implies that borrowers will incur one finance charge, despite the fact that the fine print creates multiple finances charges.[9] Likewise, the TILA box states that borrowers are obligated to repay a fixed sum, despite the fact that the fine print obligates borrowers to repay a scaled sum that is determined by ten finance charges that triple the "total of payments" stated in the TILA box by increasing "the dollar amount the credit will cost you" from $90.00 to $675.00.

It requires no citation of authority to demonstrate that the "net impression" of a boldfaced representation, which states that the borrower is responsible to repay a fixed sum, is misleading when the fine print indicates that the boldfaced fixed sum is not fixed. *But see* BLACK'S LAW DICTIONARY (9th ed.2009), misleading ("calculated to be misunderstood"); *Figgie Int'l, Inc.,* 994 F.2d at 604 ("Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole.")

Second, the loan note's "net impression" is misleading because the loan note hides material terms. Neither the TILA box nor the fine print state that borrowers are automatically enrolled in a costly "renewal" plan. This provision, which is material

---

**8.** The phrase "loan is due," which appears in the seventh line of the fine print, is ambiguous because it is unclear when the loan is due because the fine print automatically enrolls borrowers in a renewal plan.

**9.** Because the FTC Act requires the court to determine what "net impression" the loan note creates, it is irrelevant to the court's section 5 inquiry that Regulation Z does not require lenders to disclose whether multiple finances charges may be incurred. *See* 12 C.F.R. § 1026.17.

to the parties' legal obligations, is implied. Defendants' loan note merely states that the borrower may "decline the option of renewing your loan." The word "automatic," which is the legal effect of this clause, never appears.

Third, the loan note's "net impression" is misleading because the provisions regarding declining "renewal" are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Fourth, the loan note's "net impression" is misleading because the provisions regarding payment are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

Fifth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (# 493) at 16:16–17) (stating that borrowers could only decline renewal through the email-and-hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who sends the email containing the hyperlink three days after the loan is funded. The contradiction between what the loan note says and what actually occurred is misleading as a matter of law.

Sixth, the court's conclusion that the loan note's "net impression" is misleading is bolstered by (1) the approximately 8,500 consumer complaints submitted by the FTC, which state that Defendants' loan terms were confusing and deceptive; (2) statements from Defendants' own employees, admitting that the loan terms are confusing and should be changed; and (3) Defendants' practice of refusing to "explain how the loans[s] work[ ]." [10] (*See also* Email to Defendant Sales Representative from Defendants' Training and Development Manager (# 456–72) at 1) ("When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation

10. (*See* Pl.'s Summ. J. Mot. (# 456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints); (*id.* at ¶ 74 (citing Exs. 94–100); (*id.* at ¶ 65) ("Anyone calling in that does not have an existing account—you cannot explain how the loan works.") (citing Ex. 13); (*see also* Jan. 28 Order at 25:10–11) (denying Defendants' motions to exclude and admitting these exhibits into evidence).

and I believe that a lot of it has to do with the way it is explained.").

### ii. The loan note is ambiguous and, therefore, likely to mislead

Defendants' loan note also violates section 5 of the FTC Act because it is ambiguous as a matter of law. A contract is ambiguous if it is "reasonably susceptible" to more than one interpretation. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir.2012); *see also* 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) (stating the same).

When determining whether a contract is ambiguous, the court must consider (1) "the words of the agreement," (2) "the alternative meanings suggested by the parties, and any extrinsic evidence offered in support of those meanings," (3) "the parties' relative positions and bargaining power," (4) "whether one of the parties prepared the instrument, so that the language should be construed most strongly against it," and (5) "any conduct of the parties which reflects their understanding of the contract's meaning." *See* 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.).

The plain language of the loan note compels a finding of ambiguity for six reasons. First, under the heading, "Disclosure of Credit Terms," Defendants' TILA box states that borrowers are obligated to repay a fixed sum that is equal to one finance charge for one pay period plus the amount borrowed. However, confusing language in the fine print states, *inter alia*, that the borrower's obligation is not limited to a fixed amount, the borrower is automatically enrolled in a costly "renewal" plan, and the "total of payments" identified in the TILA box triples under the terms of the "renewal" plan.

Second, material portions of the loan note are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Third, material portions of the loan note are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

Fourth, material portions of the loan note are hidden. The fine print automatically enrolls borrowers in Defendants' costly "renewal" plan. This provision is hidden from borrowers. Neither the TILA box nor the fine print state that borrowers are automatically enrolled in the "renewal" plan. In fact, the word "automatic" never appears in the loan note. Rather, Defendants imply that enrollment is automatic by stating that the borrower may "decline the option of renewing [his or her] loan." (First Amend. Compl. (# 386) at ¶ 36); (Pl.'s Summ. J. Mot. (# 456) at ¶ 27). This creates ambiguity.

Fifth, the format of the loan note creates uncertainty. A box randomly divides the fine print, and two footnotes, demarcated with an asterisk and an the letter "(e)" are haphazardly placed within the body of the fine print. This has the effect of visually prioritizing one half of the fine print above the rest, hiding important information—including the provision that makes "renewal" automatic—and, disrupting the reader's understanding of the loan note as a whole.

Sixth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (# 493) at 16:16–17) (stating that borrowers could only decline renewal through the email-and-hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who delays sending the email containing the hyperlink until three days after the loan is funded. The contradiction between what the loan note says and what actually occurred creates ambiguity.

The "alternative meanings suggested by the parties" also supports a finding of ambiguity. The FTC submitted approximately 8,500 consumer complaints demonstrating that consumers were confused and interpreted Defendants' loan documents as obligating the borrower to repay a fixed sum equal to a finance charge plus the amount borrowed. (*See* Pl.'s Summ. J. Mot. (# 456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints). Additionally, the FTC proffered evidence that Defendants were aware of the borrower's confusion and trained their employees to avoid explaining the loans terms. (*See* Email (# 456–72) at 1) ("When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained.").

The parties' "relative positions and bargaining power" also militates in favor of a finding of ambiguity. It requires no citation of authority to recognize that payday loan borrowers are primarily indigent, unsophisticated, and not accustomed to interpreting contracts. Defendants, by contrast, are familiar with the offer and sale of credit, have issued five million loans since 2008, and are represented by Kirkland & Ellis, LLP. (*See* Def.'s Summ J. Opp'n (# 493) at 55:18) (stating that Defendants have issued over five million loans since 2008).

Finally, the Defendants conduct "reflects [an] understanding of the contract's meaning," which Defendants sought to conceal from borrowers. (*See, e.g.,* Email (# 456–72) at 1). This counsels strongly in favor of finding that the contract is ambiguous.

The court, therefore, concludes that Defendants' loan note is ambiguous as a matter of law. The court may make this determination *sua sponte*. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 571 n. 10 (5th Cir.2010). This determination is appropriate for summary judgment. 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) ("The determination of whether a contract is ambiguous is

a question of law for the court.").[11]

Additionally, because "ambiguous" means "open to more than one interpretation," *see* MERRIAM-WEBSTER (10th ed.2010), the court holds that Defendants' loan documents are "likely to mislead" under section 5 of the FTC Act. *Trans World Accounts, Inc.,* 594 F.2d at 214 (stating that a representation is "misleading" is it "possesses the tendency to deceive").

### 3. The Representations in the Loan Note are "Material"

The court also finds that Defendants' representations were "material." *See Gill,* 265 F.3d at 950 (identifying the third element for a section 5 violation as a representation that is "likely to mislead consumers"). The number of finance charges, the total amount owed, the existence of an automatic renewal plan, and the procedure for declining the renewal plan are material terms of a loan contract.

### C. Defendants Failed to Satisfy their Burden because the Factual Disputes Proffered are "Immaterial"

Because the court finds that the FTC satisfied its burden of demonstrating the absence of a genuine issue of material fact, Federal Rule of Civil Procedure 56 shifts the burden and requires Defendants to present specific facts showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The court finds that Defendants failed to satisfy their burden for two reasons: (1) Defendants do not dispute the actual terms of the TILA box and fine print, which—as the court held above—are contradictory and misleading; and (2) the eight factual disputes proffered by Defendants are "immaterial." The court addresses each reason below.

### 1. Defendants do not Dispute the Loan Note's Terms

The court concludes that Defendants failed to satisfy their burden of presenting specific facts showing that there is a genuine issue for trial because Defendants do not dispute the actual terms of the TILA box and fine print. (*See, e.g.,* Def.'s Opp'n (# 493) at 13–16). The actual terms of the TILA box and fine print provide the basis for the court's holding that Defendants violated section 5 of the FTC Act. (*See supra* § 1.B).

Defendants attempt to create a factual dispute regarding the loan terms by arguing that "the parties genuinely dispute the impression created by Defendants' loan documents." (*See* Def.'s Opp'n (# 493) at 43:12–45:15). This argument bolsters the court's holding that the loan documents are misleading. The problem presented by Defendants' loan documents is that their terms are "disputable" because the TILA box and fine print are "misleading" and "ambiguous" as a matter of law.

Presumably, Defendants intended to argue is that summary judgment is inappropriate because there is a material factual dispute regarding the "net impression" the loan documents create. This argument is unpersuasive for two reasons. First,

11. Defendants argue in a footnote that if the court determines that the loan note is ambiguous, summary judgment must be denied. (Def.'s Reply (# 512) at 16:21 n. 54). This is incorrect. In support, Defendants cite *Castaneda v. Dura–Vent Corp.,* 648 F.2d 612, 619 (9th Cir.1981). *Castaneda* was a contract case for declaratory relief. There, the court found the contract to be ambiguous, which required a fact finder to determine the intent of the parties. Here, all that must be determined is whether the loan was "likely to mislead." A finding of ambiguity disposes of counts one and three because ambiguity, by definition, misleads. *See* MERRIAM-WEBSTER (10th ed.2010), ambiguous (defined as "open to more than one interpretation"). Unlike *Castaneda,* this court is not required to make the additional factual finding that *Castaneda* required: what the parties actually intended.

where "net impression" concerns the terms of a contract, "net impression" is a question of law, not fact. *See Native Am. Serv's, Inc. v. Givens,* 213 F.3d 642 (9th Cir.2000) ("[T]he meaning of a contract is a question of law"); RESTATEMENT (FIRST) OF CONTRACTS § 230 (1932) ("[W]hether or not the language is ambiguous is a question of law for the court, which will analyze whether there is more than one reasonable interpretation which can be gleaned from the contract language"); 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) ("The determination of whether a contract is ambiguous is a question of law for the court.")

It is only with FTC enforcement actions involving advertisements, which judges are not trained to interpret, that the "net impression" is generally a question of fact. *See Nat'l Bakers Serv's, Inc. v. F.T.C.,* 329 F.2d 365, 367 (7th Cir.1964) (citing state law) ("The meaning of an advertisement is a question of fact."); *see also F.T.C. v. Nat'l Urological Group, Inc.,* 645 F.Supp.2d 1167, 1189 (N.D.Ga.2008) (citing *F.T.C. v. QT, Inc.,* 448 F.Supp.2d 908, 958 (N.D.Ill.2006) ("The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact")).

Second, even in the context of advertisements, summary judgment is appropriate where—as here—the representation is clearly misleading and the defendant relies exclusively on the fine print to correct the misrepresentation. *See F.T.C. v. Gill,* 265 F.3d 944, 957 n. 10 (9th Cir.2001); (affirming the district court's granting of summary judgment where "at least one of defendants' [advertisement representations] is illegal as a matter of law"); *Cyberspace.Com LLC,* 453 F.3d at 1200 (stating that a representation "may be likely to mislead by virtue of the net impression to makes even though the [representation] also contains truthful disclosures [in the

fine print]"); *Figgie Int'l, Inc.,* 994 F.2d at 604 (stating that truthful fine print disclosures do not render a representation not deceptive); *Floersheim,* 411 F.2d at 876–78 (stating the same); *Brown & Williamson Tobacco Corp.,* 778 F.2d at 42–3 (stating the same); (*see also* Def.'s Opp'n (# 493) at 43:23–45:8) (relying exclusively on the fine print to correct Defendants' TILA box representations).

2. *The Remaining Factual Disputes Proffered by Defendants are "Immaterial"*

The remaining eight factual disputes proffered by Defendants are all "immaterial." As stated above, "material facts" are facts that may affect the outcome of the case. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249, 106 S.Ct. 2505 (citing 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93–95 (1983)).

The first immaterial factual dispute that Defendants proffer is that "the FTC has improperly pursued a series of shifting, conflicting theories for count one." (*See* Def.'s Opp'n (# 493) at 38:9–43:6). This argument is "immaterial" for two reasons. First, "shifting legal theories" do not create "factual disputes." *See Liberty Lobby, Inc.,* 477 U.S. at 248–252, 106 S.Ct. 2505. Second, this argument only addresses the FTC's allegation that Defendants violated section 5 of the FTC Act because they represented that they would withdraw funds from borrower's accounts on a single day when, in fact, Defendants withdrew funds on multiple days. (*See* Def.'s Opp'n (# 493) at 38:9–43:6) (discussing paragraph 47(a) of the FTC's complaint). This allegation is immaterial because the court's holding rests on paragraph 47(b) of the FTC's complaint, which addresses representations in the TILA box and fine print.

(*See supra* § 1.B) (basing the court's holding on paragraph 47(b)).

The second immaterial factual dispute Defendants proffer is that "the FTC's consumer witness testimony creates a genuine dispute about the impression created by loan documents." (*See* Def.'s Opp'n (# 493) at 45:16–47:4). This argument is immaterial because "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC,* 827 F.Supp.2d at 1215.

The third immaterial factual dispute Defendants proffer is that "Dr. Scheffman's expert testimony creates a genuine dispute of fact as to consumer confusion and deception." (*See* Def.'s Opp'n (# 493) at 47:5–48:2). This argument is immaterial for the same reasons stated above: "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC,* 827 F.Supp.2d at 1215.

The fourth immaterial factual dispute Defendants proffer is that "the FTC's own consumer hearsay creates a genuine factual dispute about the impression created by Defendants' loan documents." (*See* Def.'s Opp'n (# 493) at 48:3–49:21). This argument is immaterial for the same reasons stated above: "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC,* 827 F.Supp.2d at 1215.

The fifth immaterial factual dispute Defendants proffer is that "Defendants did not intend to mislead consumers." (*See* Def.'s Opp'n (# 493) at 49:22–51:8). This argument is immaterial because "intent" is irrelevant under section 5. *See Gill,* 265 F.3d at 950. ("An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and, third, the representation, omission, or practice is material.' ").

The sixth immaterial factual dispute Defendants proffer is that "TILA compliance is a safe harbor against FTC Act claims based on the same disclosures." (*See* Def.'s Opp'n (# 493) at 45: 6–55:7). This argument is immaterial because, as discussed below, Defendants violated TILA. (*See infra* § II).

The seventh immaterial factual dispute Defendants proffer is that "the FTC cannot show a significant minority of consumers likely were misled." (*See* Def.'s Opp'n (# 493) at 55:8–56:11). As stated above, this argument is immaterial because "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC,* 827 F.Supp.2d at 1215. Additionally, the FTC has demonstrated that a "significant minority" of consumers were misled. (*See* Pl.'s Summ. J. Mot. (# 456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints).

The eighth immaterial factual dispute Defendants proffer is that Defendants' "telephonic representations" do not demonstrate a "pattern or practice" of deception. (*See* Def.'s Opp'n (# 493) at 56:12–57:28). This argument is immaterial because it is irrelevant to the court's holding: the plain language of loan note is contradictory and misleading. As a result, this argument cannot "affect the outcome of the case." *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505.

## II. Count III: the FTC's Motion for Summary Judgment is Granted & Defendants' Motion for Summary Judgment is Denied

Defendants' loan note also violated the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* and Regulation Z. Because the loan note is ambiguous as a matter of law, it did not "reflect the credit terms to which the

parties are legally bound" at the outset of the transaction. *See* 12 C.F.R. § 1026(a). The court's analysis proceeds in three parts: (1) a review of the Truth in Lending Act and Regulation Z; (2) a finding that the FTC satisfied its initial burden demonstrating the absence of a genuine issue of material fact; and, (3) a finding that Defendants failed to satisfy their burden because the factual disputes proffered are immaterial and irrelevant.

### A. The Truth in Lending Act, 15 U.S.C. §§ 1601 et seq.

Congress enacted the Truth in Lending Act of 1968 ("TILA" or the "Act") to promote "economic stabilization" and consumers' "informed use of credit." *See* 15 U.S.C. § 1601(a) (originally enacted as Title I of the Consumer Credit Protection Act, Pub.L. 90–321, 82 Stat. 146 (1968)). The Act achieves this end by requiring lenders to extend credit on terms that are transparent. *Beach v. Ocwen Fed. Bank,* 523 U.S. 410, 412, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998) ("[T]he Act requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights.").

TILA is implemented by Regulation Z, 12 C.F.R. § 1026(a). Where, as here, a creditor offers "closed-end" credit,[12] the creditor's loan note disclosures must comply with Subpart C, 12 C.F.R. § 1026.17. In pertinent part, Subpart C mandates creditors to disclose "clearly and conspicuously" in writing "the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(a), (c). This includes, *inter alia,*

the loan's finance charge, annual percentage rate, due date, and period of payments scheduled to repay the total of payments, and a total of payments. 12 C.F.R. § 1026.17(c).

A TILA violation does not require actual harm or deception. *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1145 (11th Cir. 1994) *abrogated on other grounds by Veale v. Citibank, F.S.B.,* 85 F.3d 577 (11th Cir. 1996); *Zamarippa v. Cy's Car Sales,* 674 F.2d 877, 879 (11th Cir.1982) ("[I]t is unnecessary to inquire as to the subjective deception or misunderstanding of particular consumers."). This means that an objective standard is used, and that creditors cannot comply with TILA by abusing the fine print. *Id.* The reason for this, as the Supreme Court has stated, is that TILA disclosures must be "meaningful." *Chase Bank USA, NA v. McCoy,* 562 U.S. 195, ––––––––, 131 S.Ct. 871, 874–75, 178 L.Ed.2d 716 (2011) ("Congress passed TILA to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms' "). Likewise, the Ninth Circuit has stated that TILA requires "absolute compliance by creditors." *Rubio v. Capital One Bank,* 613 F.3d 1195, 1199 (9th Cir.2010) (citations omitted)

The question of whether a creditor's TILA disclosures meaningfully "reflect the credit terms to which the parties are legally bound" is a question of state law. *See* Official Staff Comments, 12 C.F.R. § 226, Supp. I, 226.9(b) cmt. 1 ("*Legal obligation.* The disclosures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures. i. The legal obligation is determined by

---

**12.** Closed-end transactions "include any credit arrangement that does not fall within the definition of open-end credit." Open-end credit plans are those in which "the creditor reasonably contemplates repeated transactions." 15 U.S.C. § 1602(j); 12 C.F.R.

§ 226.2(a)(20). Credit cards and home equity lines of credit are examples of open-end credit plans. *See Hofstetter v. Chase Home Fin., LLC,* 751 F.Supp.2d 1116, 1124 (N.D.Cal. 2010).

applicable state or other law.") (emphasis original). Whether a creditor's TILA disclosures are inaccurate, misleading, or confusing ordinarily will be for the fact finder.

However, where, as here, the disclosure is ambiguous as a matter of law, summary judgment is appropriate. *See Bartholomew v. Northampton Nat. Bank of Easton,* 584 F.2d 1288, 1293 (3d Cir.1978); *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir.1978); *Weaver v. General Finance Corp.,* 528 F.2d 589, 590 (5th Cir.1976); *Allen v. Beneficial Fin. Co.,* 531 F.2d 797 (7th Cir.1976), *cert. denied,* 429 U.S. 885, 97 S.Ct. 237, 50 L.Ed.2d 166 (1976).

### B. *The FTC Satisfied its Burden of Demonstrating the Absence of a Genuine Issue of Material Fact regarding Count Three*

The FTC satisfied its burden of demonstrating the "absence of a genuine issue of material fact" regarding count three. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Count three alleges that Defendants violated TILA and Regulation Z by failing to disclose "the terms of the legal obligation between the parties" before extending credit. (First Amend. Compl. (# 386) at ¶ 58). As discussed above, the loan note is ambiguous as a matter of law. (*See supra* § I.B.2.ii). Ambiguous disclosures, by definition, are not clear, conspicuous, or meaningful disclosures. This violates TILA and Regulation Z.[13] *See Watts v. Key Dodge Sales, Inc.,* 707 F.2d 847, 852 (5th Cir.1983) (imposing liability under TILA and Regulation Z because defendant's disclosure was "ambiguous"); *In re Whitley,* 772 F.2d 815, 815 (11th Cir.1985) (per curiam) (holding the same).

### C. *Defendants Failed to Satisfy their Burden because the Factual Disputes Proffered are "Immaterial"*

Because the FTC satisfied its burden, Rule 56 requires Defendants to present "specific facts" showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Defendants failed to satisfy this burden because they proffered arguments and not facts. Nonetheless, both of Defendants' arguments fail as a matter of law. First, contrary to Defendants' assertion, the loan note may have legally obligated borrowers to renew their loans. Second, whether the FTC's extrinsic evidence is inadmissible, as Defendants contend, is immaterial. Both arguments are addressed below.

#### 1. *Borrowers may have been "Legally Obligated" to Renew Loans*

Defendants' opposition and motion for summary judgment contend that count three presents one—and only one—question: "Were the borrowers who took loans from the Lending Defendants obligated to renew their loans? If not, then the Lending Defendants complied with the Truth in Lending Act and are entitled to summary judgment on Count III. If so, then the FTC is correct and the Lending Defendants failed to disclose the borrower' legal obligations at the outset of the loan." (Def.'s Summ. J. Mot. (# 461) at 1:2–6); (Def.'s Opp'n (# 493) at 61:7–9); (*see also* LittleAxe Joinder (# 465) at 2:9). The court disagrees.

The question under TILA is not a technical question of whether borrowers were "legally obligated" to renew their loans. The question is whether the loan note provided clear, conspicuous, and meaningful

---

13. A corollary of this is that Defendants' motion for summary judgment on count three fails. Defendants cannot demonstrate that they are entitled to judgment as a matter of law under Rule 56(a) because their loan note is ambiguous and violates TILA and Regulation Z as a matter of law.

disclosures regarding "the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(a), (c). Because Defendants' loan note is ambiguous as a matter of law (*see supra* § I.B.2.ii), "the terms of the legal obligation between the parties" were not "clearly and conspicuously" disclosed, as TILA requires. *See Watts*, 707 F.2d at 852; *In re Whitley*, 772 F.2d at 815.

For the sake of clarity, the court reiterates the six reasons why the loan note's plain language is ambiguous as a matter of law. First, under the heading, "Disclosure of Credit Terms," Defendants' TILA box states that borrowers are obligated to repay a fixed sum that is equal to one finance charge for one pay period plus the amount borrowed. However, confusing language in the fine print states, *inter alia*, that the borrower's obligation is not limited to a fixed amount, the borrow is automatically enrolled in a costly "renewal" plan, and the "total of payments" identified in the TILA box triples under the terms of the "renewal" plan.

Second, material portions of the loan note are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Third, material portions of the loan note are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH de-bit on that Account in the amount specified."

Fourth, material portions of the loan note are hidden. The fine print automatically enrolls borrowers in Defendants' costly "renewal" plan. This provision is hidden from borrowers. Neither the TILA box nor the fine print state that borrowers are automatically enrolled in the "renewal" plan. In fact, the word "automatic" never appears in the loan note. Rather, Defendants imply that enrollment is automatic by stating that the borrower may "decline the option of renewing [his or her] loan." (First Amend. Compl. (# 386) at ¶ 36); (Pl.'s Summ. J. Mot. (# 456) at ¶ 27). This creates ambiguity.

Fifth, the format of the loan note creates uncertainty. A box randomly divides the fine print, and two footnotes, demarcated with an asterisk and an the letter "(e)" are haphazardly placed within the body of the fine print. This has the effect of visually prioritizing one half of the fine print above the rest, hiding important information—including the provision that makes "renewal" automatic—and, disrupting the reader's understanding of the loan note as a whole.

Sixth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (# 493) at 16:16–17) (stating that borrow-

ers could only decline renewal through the email-and-hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who delays sending the email containing the hyperlink until three days after the loan is funded. The contradiction between what the loan note says and what actually does creates ambiguity.

Accordingly, the question of whether borrowers were "legally obligated" to renew their loans is inapposite. The loan note is ambiguous and, therefore, fails to reflect "the terms of the legal obligation between the parties" at the outset of the transaction. This violates TILA and Regulation Z. *See Watts,* 707 F.2d at 852; *In re Whitley,* 772 F.2d at 815.

It is of no consequence to the court's analysis that some of the ambiguous provisions—like the automatic enrollment provisions and opt-out procedures—are not included in Regulations Z's mandatory disclosures. Congress and the Supreme Court have stated that TILA's purpose is to " 'promote the informed use of credit' by requiring 'meaningful disclosure terms.' " *Chase Bank,* 131 S.Ct. at 874–75 (citing 15 U.S.C. § 1601(a)). Permitting lenders to funnel borrowers through a deceptive renewal provision that subjects borrowers to unfavorable terms would render TILA and Regulation Z meaningless. As stated—per curiam—by the

Ninth Circuit: "If lenders were permitted to include additional information in any form they wish, unsophisticated consumers would be handicapped in making ready comparisons." *LaGrone v. Johnson,* 534 F.2d 1360, 1362 (9th Cir.1976) (per curiam); *see also Wright v. Tower Loan of Mississippi, Inc.,* 679 F.2d 436, 445 (5th Cir.1982) (citing *Williams v. Blazer Fin. Servs.,* 598 F.2d 1371, 1374 (5th Cir.1979)) ("The entire thrust of contemporary credit legislation is to make credit contract terms comprehensible.").

It is also of no consequence that Defendants can articulate an unambiguous interpretation of the loan note, which—with the guidance and skill of a trained attorney—proves to be the technically correct interpretation. TILA and Regulation Z specify that the parties' "legal obligation[s] are determined by state law." *See* Official Staff Comments, 12 C.F.R. § 226, Supp. I, 226.9(b) cmt. 1 (*"Legal obligation.* The disclosures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures. i. The legal obligation is determined by applicable state or other law.") (emphasis original). Under the applicable state law, technicalities are irrelevant. A contract is ambiguous if it is reasonably—not technically—susceptible to more than one interpretation. *Skilstaf, Inc.,* 669 F.3d at 1015; 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.). As discussed above, there are at least six reasons why the loan note is "reasonably" susceptible to more than one interpretation. (*See supra* § I.B.2.ii). These six ambiguities violate TILA.[14] *Watts,* 707 F.2d at 852 ("At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whit-*

14. Because a TILA violation also constitutes a violation of the FTC Act, *see* 15 U.S.C. § 1607(c), to avoid liability as a matter of law Defendants must show, *inter alia,* that it is **unreasonable** for a borrower to think that he or she can decline renewal by "telling" the lender when the loan note states that a borrower may decline renewal by "telling" the lender. (*See supra* § I.B.2.ii) (discussing the loan note's ambiguities).

*ley,* 772 F.2d at 815 (following *Watts* holding that ambiguous disclosures violate TILA).

### 2. *Whether the FTC's Extrinsic Evidence is Admissible is "Immaterial"*

The remaining factual dispute that Defendants proffer to defeat summary judgment on count three is immaterial. The only remaining factual dispute that Defendants proffer is that "the FTC's extrinsic evidence is inadmissible." (*See* Def.'s Opp'n (# 493) at 66:6–70:14); (*see also* Def.'s Summ. J. Mot. (# 461) at 16:21–19:5). This argument is "immaterial" because (1) the evidence is admissible (*see* Jan. 28 Order at 25:10–11) and (2) the court's holding would not change without the extrinsic evidence. As a result, this argument cannot "affect the outcome of the case." *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505.

### III. *Counts II & IV: the FTC's Motion for Summary Judgment is Denied*

The FTC's motion for summary judgment on counts two and four is denied because the FTC's motion, while warranted under the circumstances, overlooks the purpose of the court's bifurcation order, which allowed the Muir Defendants to delay litigation until phase two. As a result, the court must deny the FTC's motion for summary judgment on counts two and four under Federal Rule of Civil Procedure 56(d).

On December 27, 2012, the court entered a stipulated preliminary injunction and bifurcation order. (Bifurcation Order (# 296) at 10). Under the bifurcation order, no discovery regarding any claims or defenses involving the Muir Defendants would occur until phase two. (*Id.*); (*see also* Muir Def.'s Opp'n (# 490) at 2).

On July 18, 2013, the following Defendants (*i.e.,* "the Settling Defendants") stip-ulated to settle counts two and four: AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc., MNE Services, Inc., Scott A. Tucker, Blaine A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, LeadFlash Consulting, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LCC, Don E. Brady, Robert D. Campbell, and Troy L. LittleAxe, Jr. (Stip. Mot. (# 446) at 1).

This was unexpected. The court's bifurcation order did not envision a partial settlement by less than all Defendants. The bifurcation order divided litigation into two phases: (1) a liability phase, in which the Settling Defendant's would litigate their potential liability; and, (2) a relief phase. When that order was entered, all Defendants were litigating all issues, including whether the Muir Defendants could be held liable for the actions of the Settling Defendants.

Because of the settlement was not yet approved, on September 30, 2013 the FTC moved for summary judgment on all counts against all Defendants. (Pl.'s Mot. Summ. J. (# 454) at 1). On October 8, 2013, the court approved the Settling Defendants' stipulated settlement. (*See* Order (# 478) at 1–13). This changed the context of the bifurcation order. On November 4, 2013, the FTC withdrew its motion for summary judgment on counts two and four against a number of Defendants because they had settled claims. (*See* Withdrawal Mot. (# 487) at 2). However, the FTC did not withdraw its motion for summary judgment against the Muir Defendants. (*See generally id.*)

In light of the Settling Defendants' not opposing summary judgment on counts two and four, the court must deny the FTC's motion for summary judgment on counts two and four in order to preserve the substance and spirit of the court's bi-

furcation order and afford the Muir Defendants an opportunity to conduct discovery and litigate the relevant claims and defenses. *See* FED. R. CIV. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it."); (*see also* Muir Decl. (# 490) at Exhibit A) (stating that the Muir Defendants have not yet been afforded the opportunity to conduct discovery). Accordingly, in order to effect the principles and purpose announced by the bifurcation order, the court denies the FTC's motion for summary judgment on counts two and four without prejudice, and defers consideration of courts two and four as to the Muir Defendants until phase two.

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that the FTC's motion for summary judgment (# 454) be GRANTED in part and DENIED in part.

IT IS FURTHER RECOMMENDED that the FTC's motion for summary judgment be GRANTED on COUNT I and COUNT III.

IT IS FURTHER RECOMMENDED that the FTC's motion for summary judgment be DENIED WITHOUT PREJUDICE on COUNT II and COUNT IV.

IT IS FURTHER RECOMMENDED that Defendants' motion for summary judgment (# 461) be DENIED.

IT IS FURTHER RECOMMENDED that the Bifurcation Order be AMENDED to permit claims two and four to proceed against the Muir Defendants during phase two.

IT IS SO RECOMMENDED.

DATED this 28th day of January, 2014.